UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN W. MALBURG, Personal
Representative of the Estate of                         Case No. 11-14856
RANDY WILLIAM MALBURG,
Deceased,

                        Plaintiff,                      Paul D. Borman
                                                        United States District Judge
v.

BRIAN E. GRATE and KAGY
FARMS, LLC, jointly and severally,

                        Defendants.
_____/

OPINION AND ORDER DENYING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF NO. 14)

        This matter is before the Court on Defendants Brian E. Grate and Kagy Farms, LLC's

("Defendants") Motion for Summary Judgment.  (ECF No. 14.)  Plaintiff filed a response (ECF No.

16) and Defendants filed a reply (ECF No. 24).  The Court held a hearing on May 29, 2013.  For the

reasons that follow, the Court DENIES Defendants' motion for summary judgment.

**INTRODUCTION**

        This wrongful death action arises out of an accident that occurred on a pig farm operated by

the decedent, Randy Malburg.  While directing the unloading of a trailer delivering 300 feeder pigs

to the Malburg Farm, Mr. Malburg became pinned at his head and neck between the tractor trailer

that was delivering the pigs and the chute attached to his barn, onto which the pigs were to have

been unloaded.  The personal representative of decedent's estate, Kevin W. Malburg, brings this

action on behalf of the estate.

1

The Defendants now move for summary judgment, denying the breach of any duty owed to Plaintiff's decedent and alternatively arguing that, if Defendants are found to have been negligent in some measure, Plaintiff's decedent's negligence was an unforeseen, intervening and superseding cause of his injuries, precluding a finding that either of the Defendants was the proximate cause of Plaintiff's decedent's death. Finally, Defendants argue that assuming they were negligent in some measure, Plaintiff's decedent was more than 50% negligent and therefore Plaintiff is not entitled to any amount of non-economic damages under applicable Michigan law.

## I.      BACKGROUND

This case arises from a fatal accident that occurred during the delivery of a truck load of feeder pigs to the decedent's farm. On at least 30 prior occasions over a span of approximately ten years, pigs had been delivered to the decedent's farm by these Defendants and by others in the same manner utilized on the day of the accident. However, on this particular day, October 20, 2010, the delivery did not proceed, as it had on those prior occasions, without incident. On this day, Randy Malburg, the decedent, somehow became fatally pinned between the rear of the truck delivering the pigs and the chute that the decedent had constructed to offload pigs from the truck into his barn. The truck was owned by Defendant Kagy Farms, LLC ("Kagy Farms") and was being driven by Defendant Brian Grate.

The decedent had been involved with the pig raising operation on his father's farm for approximately 35 years at the time the accident occurred on October 20, 2010. (Def.'s Mot. Ex. A, April 10, 2012 Deposition of John Malburg 8-9.) The decedent's father retired from the pig raising business sometime around 2002 and the decedent began to oversee the pig raising operation on the Malburg Farm. (*Id*. at 9.) As pertinent to this action, the operation at decedent's farm involved

2

feeding, caring for and raising "feeder pigs," from approximately their eighth week of life until the pigs reached a weight of approximately 270 pounds, which typically took about 120 months of care and feeding, at which time they were returned to non-party Archbold Elevator, for sale and slaughter. (Defs.' Mot. Summ. Judg. Ex. B, June 14, 2012 Deposition of Christopher Ott 5-7.)

Under a contract with non-party Archbold Elevator, the Malburgs had taken delivery of loads of approximately 300 hundred feeder pigs, at least twice during any given year, over a period of approximately 10-15 years. (Ott Dep. 5-8; Malburg Dep. 11.) Christopher Ott, the swine manager for Archbold Elevator, testified that Archbold had a written one-page contract with the decedent under which the Malburgs fed and cared for the young pigs that were owned by Archbold. (Ott Dep. 5-8.) Archbold used the Defendant Kagy Farms as one of its delivery companies. (*Id*. at 15.) The one-page written agreement between Archbold and the decedent was a one-time executed master agreement that simply described that the decedent would bring the pigs in, care for them, feed them, treat them if they were sick, make sure they were in a properly ventilated building and load them back out when they reached the target weight. (*Id*. at 8-9.)

Livestock delivery trucks are similarly configured, with an outlet door at the rear of the truck that is a little less than half the width of the tractor trailer. (Malburg Dep. 17; Pl.'s Resp. Ex. C, Photographs of Truck.) This particular truck was a two-level hauling trailer with five pens on the top and six pens on the bottom, with a capacity of hauling 505 pigs. On the day of the accident, the truck was hauling approximately 300 pigs to the Malburg Farm. (Pl.'s Resp. Ex. D, June 1, 2012 Deposition of Brian Grate, p. 41, Ex. A, Sketch of Truck Layout.) All of the pens were gated except the lower level pen nearest the rear of the trailer and adjacent to the rolling door through which the pigs were to be offloaded onto the decedent's chute. (*Id*.)

3

The chute at the Malburg Farm that accepts the pigs for unloading was designed by Randy Malburg with sides that extend out from the chute and fit just inside the narrower rolling door of the trailer, with little or no margin on each side so that the pigs are directed into the chute when the delivery door is opened and cannot squeeze out on either side. (Malburg Dep. at 18.) The extension that fits into the delivery door is a simple plywood construction that was capable of being altered without significant time or expense. (*Id*. at 19; Pl.'s Resp. Ex. B, Photographs of Chute.) According to decedent's brother, John Malburg, the decedent and his father constructed the pig chute without any professional input about the means and methods to take livestock delivery. (Malburg Dep. 11-12.) To John Malburg's knowledge, there were no policies or procedures at the Malburg Farm about how to accept delivery of livestock safely. (*Id*. at 12.) Pigs had been delivered to the Malburg Farm two to three times a year for at least 10 to 15 years, utilizing the same chute method of unloading that was employed in the instance of the decedent's fatal injury. (*Id*. at 10-11.) On the day of the fatal accident, John Malburg was present at the time that Defendant Grate was lining up the truck to unload the pigs. He left the scene just shortly before the accident occurred. He testified that the decedent could have asked him to act as a spotter and help direct Grate to line up the truck with the pig chute to unload the pigs, but neither the decedent nor Grate asked for his help. (*Id*. at 13-14, 24.)

Christopher Ott, the swine manager for Archbold Elevator, testified that he was present on decedent's farm at least ten times over the years when pigs were delivered and that the decedent always stood in the chute and directed the driver back by extending his hand out over the edge of the chute. (*Id*. at 13.) Indeed, Ott himself had driven trucks and backed them up with the decedent directing from the chute without a third person spotting from the ground. (*Id*. at 15, 41.) Ott testified that the design of the loading chute on decedent's farm was unusual because the plywood

side panels had to fit inside the rolling trailer door through which the pigs would offload to prevent the pigs from escaping on either side and to force the pigs down the chute. If the pen just inside the rolling trailer door was filled with a load of pigs, as it was on the day of the fatal accident, the decedent would have to lift the sliding door as the chute was in the process of marrying with the truck while it backed up. Ott had suggested to the decedent over the years that the chute be redesigned so that the truck backed up flush with the chute with fold-out side panels to direct the pigs down the chute. (*Id*. at 14.) This would avoid the need to have a person standing in the chute to lift the rolling door while the truck was lining up with the chute. Ott testified that the decedent directed and controlled the method by which the pigs were unloaded and the decedent built the chute himself and agreed that he should do something to modify it but never made the suggested changes. (*Id*. at 12-15.)

Defendant Grate, the driver of the trailer truck the day of the accident, testified as to his recollection of events on the date of the accident and also gave a statement to police who investigated at the scene of the accident that day. The police investigation report states as follows:

> Brian [Grate] said he was backing the trailer up to a loading ramp to off-load some pigs, and the Victim was directing him.
>
> At one point, the Victim came up to the cab and told the driver to keep backing up and he would guide him to the ramp. Victim went back and onto the ramp. When the driver felt the trailer bump the ramp, he set the parking brake, got out, and walked back to the Victim, then he saw the Victim was pinned between the ramp and the trailer. Driver ran back to the tractor and pulled the trailer forward, then went back to check the Victim. No response [] found. Driver called 911 and by that time the Victim had fallen to the ground on his right side. . . . Unknown for sure how the deceased got between the ramp and the trailer. All the driver could see while backing was the deceased['s] hand waving him back.

(Pl.'s Resp. Ex. A, Lenawee County Sheriff's Office Investigation Report 4.)

In his deposition, Grate explained further the circumstances of the accident:

5

Q:      Okay. So 10/20/2010 was the second time you would have been at the Malburg farm; is that right?

A:      Yes.

Q:      Was the procedure for unloading the pigs the same on both – both times you were there?

A:      Yes.

                    *                    *                    *

Q:      So describe – describe what you did once you set up your truck on what's marked on this exhibit anyway as Lyons Highway past the driveway preparing to back up.

A:      I backed the tractor-trailer in and I think I had to make – pull up and then reposition myself with the chute, you know, getting – Randy [the decedent] wasn't out there yet, he was inside the barn. And I was lining myself up with the chute as best I could.  And then I stopped and waited for Randy.

                    *                    *                    *

Q:      Would you draw in on that diagram where the truck was at the point when you finally stopped it waiting for Randy to come out of the barn?

A:      It was probably four, five feet from the  – from the chute.

                    *                    *                    *

A:      [Randy] walked up to the end of the chute and started motioning me back.

Q:      Okay. You didn't exchange words with him at that point?

A:      No. No.

Q:      So he started motioning you back towards the chute itself?

A:      Yes.

Q:      Did he get up in the chute at that point?

A:      No.

6

(Defs.' Mot. Ex. C, June 1, 2012 Deposition of Brian Grate, 47-50.)

At some point during this initial backing process, the decedent's brother, John Malburg, arrived in his pickup truck, parked his truck and got out to talk with the decedent.  (*Id*. 50-51.) Before the decedent got up in the chute for the final phase of backing the truck to the chute, decedent's brother got in his pickup truck and left, leaving Defendant Grate and the decedent to complete the offloading process.  (Pl.'s Resp. Ex. D, Grate Dep. Ex. B, Diagram of Delivery Area.) Defendant Grate and the decedent were alone on the premises at the time of the accident.  (*Id*. at 51.)

After directing Defendant Grate to jockey the truck up and back two times to align the trailer door with the chute, all from a position on the ground "in clear view" and "out of harms way," the decedent got up into the chute to motion Grate back until the trailer and chute were in contact and the pigs could be offloaded.  This final directing could not be done from the ground because, given the design of the decedent's chute and the fact that the pen just inside the rolling door was filled with pigs, the door of the trailer had to be opened at the last minute so that the side protrusions of the chute could fit inside the trailer door, and the pigs would be prevented from escaping around either side of the chute walls.  Mr. Grate explained:

> A:  [Decedent] said, "Give me a minute, I – I need to get up inside the chute and – and then I'll back you on up."  And I told him not to do it.  I said I don't like that. The sun was coming up and I said it's – it's not good.  And he – I mean no disrespect, but he kind of laughed and said, "Somebody's got to keep the little piggies on the trailer."  And I kind of stopped for a second and I said when you start raising that door, the pigs get startled and they will run to the front of their pen.  And he said – he said it will be all right, *just watch for my hand to signal you back*.  And you know, at that point, it was – it's his farm, I, you know, basically do as he says.  You know, he's the boss.

> Q:  Well, was that the same procedure that you followed the prior time that you were at the farm?

> A:  Yes.

7

Q:     And you felt uncomfortable that time I take it?

A:     I – I don't remember if anybody else was there that time.  I don't remember if Chris [Ott] was there. . . . I think he was because . . . he was there that first time.

Defs.' Mot. Ex. C, Grate Dep. 56-58 (emphasis added).

Mr. Grate testified that after expressing his concern about the decedent getting up in the chute, he didn't insist on doing it differently, although he wished he had:

Q:     Why didn't you insist on that?

A:     I wish I had of, but it was ultimately his – his call.

Q:     Well, you're the one driving the truck, right?

A:     But I work for him when I got there.

Q:     Another alternative would have been, I suppose, to just leave that bottom driver's side rear compartment [pen] empty?

*              *            *

Q:     Yeah, the driver's side rear compartment that holds 25 pigs, if you had left that empty, you could of backed up and there would have been no risk at all of pigs escaping.

A:     Right.

Q:     And Mr. Malburg could of just stood off to the side and directed you where it was completely out of harm's way?

A:     Yes.

Q:     True? Okay. So you're now sitting properly aligned to the pig chute and you had this discussion that you've described with Mr. Malburg and he went back up into the chute, right?

A:     Yes.

Q:     What happened next?

8

A:      He opened the door.

Q:      Before you started moving?

A:      Yes.

Q:      Okay. Could you see him?

A:      I could – when he motioned me back I could see him.

Q:      When he opened the door could you see him?

A:       No.

Q:      But you could hear the door open?

A:      Yes.

Q:      And then as you started to back up, it was from a complete stop?

A:      Yes.

                        *                    *                    *

Q:      And at that point was your vision somewhat obscured by the sunlight as you feared?

A:      No.

Q:      What of Mr. Malburg could you see in your rearview mirror?

A:      I could see his arm.  He put his arm out and started motioning me back.

Q:      Could you see his head?

A:      No.

Q:      Could you see – how much of his arm could you see?

A:      Maybe from just above his elbow.

                        *                    *                    *

Q:      Okay. So you're watching in your mirror the left arm of Mr. Malburg as he's

9

waving you back?

A:      Yes.

Q:      Okay. What happened next?

A:      He brought his arm in and I backed up until I felt it hit the chute.

Q:      Okay.  So you saw his arm come back in towards the chute?

A:      Yes.

Q:      And then you couldn't see him anymore?

A:      No.

Q:      Okay. And you considered and you continued to back up?

A:      Yes.

                              *                    *                    *

Q:      How did the arm get retracted in what you assumed was into the chute?

A:      Just as he's waving me back and I put the truck in reverse, he – I started
        backing up, his arm came back in, you know, like he was – like okay, he
        knows I'm doing my job, now he needs to hold the door rope or, you know.

Q:      Okay. And then you continued to back.  About how long did that process
        take after – after you saw his arm disappear?

A:      Just a – I don't know, just a few seconds, five, ten I don't know, six seconds.
        I don't really know.

Defs.' Mot. Ex. C, Grate Dep. 59-65.

Mr. Grate testified that he never heard any screams or yelling of any kind and after he felt

the truck contact the chute, he got out of the truck and walked to the back and found Randy Malburg

pinned at his head between the chute and the truck with his head facing down towards the ground,

the top of his head pointing toward the driver side of the truck.  (*Id*. at 65-66.)  He could not see the

10

decedent's feet at that time and he immediately went back to the cab and pulled the truck forward

to unpin the decedent.  He stopped the truck, ran back and found the decedent on the ground and

unresponsive.  He then ran to the house but no one answered the door and he eventually called 911

on his cell phone and was able to direct the emergency responders to the farm.  (*Id*. at 67-69.)  Grate

also called Troy Kagy and told him there had been an accident and that he thought Randy Malburg

was dead.  (*Id*. at 71.)  Shortly thereafter, and after emergency responders had arrived on the scene,

Troy Kagy and Chris Ott arrived at the farm.  (*Id*. at 71-72.)

When questioned about why he agreed to continue with the unloading of the pigs even

though he "didn't like" the process, Mr. Grate responded that Mr. Malburg was the boss, it was his

farm and Mr. Grate felt he was in no position to disagree:

Q:    Okay.  Did [someone at Kagy Farms] tell you that you couldn't refuse to do
      something that you thought was dangerous?

A:    No.

Q:    Okay. And in fact, if you – if you in fact knew that a death was going to
      occur if you did something, you could refuse to do it, couldn't you?

A:    Yeah.

Q:    And if you believe something – if you believed something to be dangerous,
      there was nothing preventing you from suggesting some other way to
      accomplish the same goal, was there?

A:    I – it was his farm. . . . It was his farm.  I – I – I expressed my concerns.  You
      know, he's like, "I do this all the time, been doing this" – you know, I mean
      I – I'm not going to, you know, come in here and tell you how to do our job.
      You know, I see something I don't like, I might say hey, you know, is that
      necessary? "Yes, it is." And then it's done, I'll do it.  He, you know, assured
      me this is how we do it every day.

Q:    But you thought it was dangerous and did it anyway?

A:    Well, he – he insisted that he does this every day.

11

> Q:     Okay. But in answer to my question, you thought it was dangerous and did it anyway?
>
> A:     Yeah.

Defs.' Mot. Ex. C, Grate Dep. 76-77.  Mr. Grate testified that beyond pure speculation, he had no idea how Mr. Malburg's head got between the chute and the rear of his trailer.  (*Id.* at 79.)

Christopher Ott, the swine manager for Archbold Elevator, testified that he was called about the accident just after it occurred and arrived at the scene of the accident about 25 minutes later.  (*Id.* at 16.)  He had a conversation with Mr. Grate who told him that he was backing the truck up just like they always did and when the bumper of the truck hit the chute he got out of the cab and walked to the back of the truck and saw the decedent was pinned.  He ran back to the cab and pulled the truck forward.  (*Id.* at 17.)  Mr. Grate told Mr. Ott that he lost sight of Mr. Malburg's hand that was directing him back at the last split second before he stopped the truck.  (*Id.* at 40-41.)  Mr. Ott testified that the decedent was "a very nervous, figgity type guy" who would try "to do 14 things at once," at times waving the driver back and at times holding the pigs back with the sorting board. (*Id.* at 31.)

Mr. Ott testified that he was unaware of any other farm that has a chute configured like the one on the Malburg Farm that required someone to be up in the chute while the truck was backing up to the chute and that he had had conversations with the decedent about the unusual nature of the chute and about how something might be done to the chute so that Mr. Malburg didn't have to stand in the chute:

> Q:     Did you ever talk to [the decedent] about whether or not something ought to be done with the shoot [sic] so he didn't need to stand in the shoot [sic]?
>
> A:     Yes, I did.

12

> Q:    And did you talk to him about that because you were concerned about the difficulties in making the delivery and safety?
>
> A:    Yes.
>
> Q:    What would you tell him?
>
> A:    My thoughts and what I always told Randy to do is to cut this part of the shoot [sic] off so that it's flush with where the bumper hits and so that when the truck gets back up to the shoot, up to the bumper pad or where the bumper hits, then you could have some flanges type doors that would flip out so the pigs wouldn't get out.  And I've seen that done on other farms.

Defs.' Mot. Ex. B, Ott Dep. at 13-14.  Mr. Ott testified that the decedent could have modified the chute at any time by cutting the ends off to obviate the need to be in the chute while the delivery truck was backing up.  (*Id.* at 44.)  Despite Mr. Ott's suggestions that decedent make such a change, the decedent never modified the chute so that he could direct delivery trucks from the ground.  (*Id.* at 14, 44.)

Bader Cassin, M.D., the Medical Examiner who performed the autopsy on the decedent, testified at his deposition that he believed he had been asked by Plaintiff to act as an expert to attempt to reconstruct the circumstances of the accident and to opine as to how Randy Malburg may have come to be pinned between the truck and the chute.  (Pl.'s Resp. Ex. H, August 9, 2012 Deposition of Bader J. Cassin, M.D. 19-20.)  Plaintiff's counsel clarified at Cassin's deposition, however, that he was listing Cassin as a "hybrid expert" and therefore did not file a Rule 26 disclosure as to Cassin and his testimony.  Plaintiff's counsel indicated Cassin would testify about "his findings at the autopsy, the condition of the body, possible sources of bleeding, and to just answer questions as a forensic pathologist who actually as part of his official responsibilities did this work and the autopsy report."  (Cassin Dep. 40.)  Cassin did not visit the scene of the accident, never personally observed the truck or the chute and only examined photographs, in addition to performing

13

the autopsy and cataloging the decedent's injuries.  (*Id*. at 21, 42.)

Cassin testified that he could not opine at all about the sequence of events that led up to the point in time when the decedent became pinned between the truck and the chute.  (*Id*. at 44-45.)  As to decedent's physical injuries, in sum, Cassin testified that the decedent suffered fractures of his skull, neck and jaw.  Cassin did opine that the truck "more likely than not" came in contact with the right side of the decedent's face, given the features on the back of the trailer and the chute and the compression marks and abrasions on either side of the decedent's face and head.  (*Id*. at 46-48, Ex. 4 Photograph of Decedent's Face and Head, Ex. 9, Photograph of Decedent, Ex. 11, Photograph of Right Side of Decedent's Face.)  Throughout the course of the deposition, Dr. Cassin actually changed his opinion as to the level of the trailer and chute at which the decedent "more likely than not" became pinned by the chute and the truck.  (*Id*. at 67.)  Dr. Cassin also opined that the blood spatters on the rear door and bumper of the trailer represented a drip pattern, rather than a spray pattern, consistent with the decedent having been pinned above the level of the blood spatters.  (*Id*. at 68.)  He further testified that all of the blood came from only two possible sources, i.e. the decedent's nose and/or mouth.  (*Id*. at 79-80.)  Dr. Cassin deduced from the splatter patterns on the rear of the trailer, which covered the lower left-hand corner of the closed rolling door, that the sliding door must have been down when decedent became pinned.  (*Id*. at 82, Exs. 5, 7, Photographs of Splash Pattern on Rear of Trailer, Bottom Portion of Sliding Door.)  Dr. Cassin did not agree with the supposition that there could have been a pool of blood on the rear bumper of the truck into which the sliding door slammed after the decedent had been pinned and injured.  (*Id*. at 84-85.)  Dr. Cassin testified that the decedent would not have died instantaneously but would have "rapidly lost consciousness and then subsequently died."  (*Id*. at 88.)

14

Plaintiff also offers the expert report of Thomas E. Green, of Dynamic Safety, LLC, who prepared an Incident Analysis Report of the accident, setting forth the results of Mr. Green's investigation of the accident.  (Pl.'s Resp. Ex. I, July 19, 2012 Incident Analysis Report of Thomas E. Green, "the Green Report".)   In preparing the Green Report, Mr. Green reviewed all police records, all photographs taken at the site of the decedent and of the truck and the chute, the autopsy report prepared by Dr. Cassin, multiple depositions and certain discovery responses as well as the Pork Quality Assurance Handbook ("PQA") and the PQA Certification Manual.  (*Id*. at 1-2.)  Mr. Green did conduct his own examination of the truck and trailer and the accident site and prepared his own images for purposes of this analysis.  (*Id*. at 2.)  The Green Report contains multiple photographs of the truck and trailer that depict additional features, and in greater detail, than the police photographs that were taken at the scene on the date of the accident.  (*Id*. at 3,4, 8, 9, 10, 11.) Mr. Green offers the following conclusions, which he asserts represent opinions of "a reasonable degree of accident reconstruction and scientific certainty," as to what occurred that day:

- The design of the chute at the Malburg Farm necessitated that the rear trailer door be opened prior to final engagement of the trailer to the chute.  If there are pigs in the pen adjacent to the rear trailer door, then the door cannot be opened until the trailer is very close to the end of the chute, so that the pigs do not escape from the trailer.  This would require a person to open the door when the trailer is very close to the chute.

- Mr. Grate is in charge of his vehicle as well as the safe movement of his vehicle and should have stopped immediately when he could no longer see Mr. Malburg behind the vehicle.

- Mr. Grate should have used a spotter to assist with backing and that spotter should at all times be visible and out of harm's way.

- If the trailer had been loaded leaving the pen adjacent to the door empty (which could have been done in this case since the trailer was far below capacity) it would have been possible to back the trailer to the chute with the door already open and Mr. Malburg could have remained standing on the

15

ground in view of Mr. Grate at all times.

- If the trailer was 2-3 feet from the chute at the time that Mr. Malburg got up into the chute, it would have taken 1.4 to 2.0 seconds to travel this distance assuming a speed of approximately 1 mph.

- Although Mr. Grate testified he heard the trailer door open, there is no physical evidence to suggest that the door was open at the time of the accident. Blood on the bottom of the door would suggest that the door was in a closed position at the time the injury occurred. Also, there is no evidence that any pigs escaped from the trailer, suggesting the door remained closed.

(Pl.'s Resp. Ex. I, Green Report 14-16.)

Finally, Plaintiff offers a report authored by Lew Grill, who has 28 years of experience as a truck driving instructor and truck driving program director and consultant for motor carriers and truck driving schools. (Pl.'s Resp. Ex. J, July 17, 2012 Report of Lew Grill, "the Grill Report," Curriculum Vitae attached to Report.) Mr. Grill has training and experience in truck accident investigation, vehicle dynamics and accident reconstruction and has testified in litigation matters in Federal and State courts throughout the country where he has qualified as an expert concerning the safe operation of commercial motor vehicles and the standard of care of commercial vehicle operators and motor carriers. (*Id*. Curriculum Vitae attached to Grill Report as Ex. 1, 1.) In preparing his report, Mr. Grill reviewed several deposition transcripts, the sheriff's report, photos of the scene, certain discovery responses, the Federal Motor Carrier Safety Regulations and Commercial Driver's License Manual. (*Id*. at 15.) Mr. Grill offers opinions on: "(1) the standard of care of truck drivers and the motor carriers who employ them; (2) Motor carrier's non-delegable duty with regard to the safe operation of a Commercial Motor Vehicle ("CMV"); (3) the duty of motor carriers and CMV operators to ensure that their vehicles are operated in a safe and prudent manner. (*Id*. at 3.) Mr. Grill opines that under the applicable safety regulations, Defendants Grate

16

and Kagy were responsible for safely transporting the load of pigs to their final destination, including getting the truck safely and properly positioned at the chute and Defendant Malburg was the consignee who received the load of pigs and who was responsible to unload the pigs once the truck was properly positioned by Mr. Grate. (*Id*. at 4.) According to Mr. Grill's interpretation of the applicable Federal Motor Carrier Safety Regulations ("FMCSRs"), the decedent was not operating a motor carrier at the time of the incident and was not subject to the FMCSRs. (*Id*. at 5.) Mr. Grill opines that Mr. Grate should not have backed his truck without having a spotter to keep him informed about the area directly behind the truck as he was backing and without arranging for specific hand signals with Mr. Malburg before beginning the backing operation. (*Id*. at 6.) Mr. Grill further opines that Mr. Grate, who was aware of and uncomfortable with the chute configuration at the Malburg Farm, could have loaded the trailer in a different manner, i.e. with no pigs in the pen adjacent to the sliding loading/unloading door, that would have permitted the decedent to remain on the ground in full view at all times while directing him back to the chute. (*Id*. at 7.)

## II.     STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order. Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'

17

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).

The rule requires the  non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).  "A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party." *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 759 (6th Cir. 2010).

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial.... In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.' Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)).

"In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  "Thus, the facts and any inferences that can be drawn from those facts[ ] must be viewed in the light most favorable to the non-moving party." *Id.* (alteration in original) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) and *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)).

## III.   ANALYSIS

### A.   The Legal Framework for Analyzing Plaintiff's Wrongful Death Claim

"Under the *Erie* doctrine, federal courts sitting in diversity apply the substantive law of the forum state and federal procedural law." *Biegas*, 573 F.3d at 374 (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).  In this negligence action, this Court applies the substantive law of Michigan. Under Michigan law, to establish a prima facie case of negligence, a plaintiff must prove that a defendant owed the plaintiff a duty, that the defendant breached that duty, that the defendant's breach was the proximate cause of plaintiff's injuries and that plaintiff suffered damages.  *Case v. Consumers Power Co*., 463 Mich. 1, 6 (2000).  "Questions about whether a duty exists are for the court to decide as a matter of law."  *Graves v. Warner Bros*., 253 Mich. App. 486, 492 (2002).

The parties appear to agree that Michigan's No-Fault Act governs the parties and the claims in this action.  The No-Fault Act applies to "motor vehicles" including "a trailer, operated or designed for operation upon a public highway by power other than muscular power which has more than 2 wheels."  Mich. Comp. Laws § 500.3101(2)(e).  The No-Fault Act provides that a person may be "subject to tort liability for non-economic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement."  Mich. Comp. Laws § 500.3135(1).

In this case, Michigan's Owner Liability Statute also applies and requires owners and drivers of vehicles to exercise ordinary care in the operation of a motor vehicle, in this case a tractor-trailer. Michigan's Owners Liability Statute provides in pertinent part that:  "The owner of a motor vehicle is liable for an injury caused by the negligent operation of the motor vehicle whether the negligence consists of a violation of a statute of this state or the ordinary care standard required by common law."  Mich. Comp. Laws § 257.401(1).  There is no dispute that in this case a duty did exist to use ordinary and reasonable care in the operation of the Kagy Farm pig hauling tractor trailer.  As

20

Defendants recognize, even "[i]n the absence of statutory requirements, it is the motorist's duty in the use and operation of his automobile to exercise ordinary and reasonable care and caution, that is, the degree of care and caution which an ordinarily prudent person would exercise under the same or similar circumstances." *Zarzecki v. Hatch*, 347 Mich. 138, 141 (1956) (citation omitted).

Under Michigan law, the doctrine of pure comparative negligence distributes responsibility according to the proportionate fault of the parties and requires that a plaintiff's damages be reduced in the same proportion by which the plaintiff's own conduct contributed to his or her injuries. *Placek v. Sterling Heights*, 405 Mich. 638, 660-61 (1979). "What pure comparative negligence does is hold a person fully responsible for his or her acts and to the full extent to which they cause injury. That is justice." *Id*. at 661 (citation omitted). The doctrine is codified at Mich. Comp. Laws § 600.2959, which provides in pertinent part:

> In an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death, the court shall reduce the damages by the percentage of comparative fault of the person upon whose injury or death the damages are based as provided in section 6306 . . . . If that person's percentage of fault is greater than the aggregate fault of the other person or persons, whether or not parties to the action, the court shall reduce economic damages by the percentage of comparative fault of the person upon whose injury or death the damages are based as provided in section 6306 . . ., and noneconomic damages shall not be awarded.

Whether considering a defendant's negligence or a plaintiff's comparative negligence, the inquiry into whether there has been a breach of the standard of care is the same:

> The general standard of care for purposes of comparative negligence, while differing in perspective, is theoretically indistinguishable from the applicable standard for determining liability in common-law negligence: the standard of conduct to which one must conform for his own protection is that of "a reasonable [person] under like circumstances." Because the nature of the objective "reasonable person" standard is indistinguishable, general negligence principles are equally applicable, and the law-fact distinction is identical.

*Lowe v. Estate Motors Ltd.*, 428 Mich. 439, 455-56 (1987). Holding that "evidence of a failure to

21

use a seat belt may be admissible to support an affirmative defense of comparative negligence," the

Court in *Lowe* observed:  "It is, of course, indisputable that, pursuant to the law of comparative

negligence, every person has an obligation to exercise reasonable care for his own safety."  428

Mich. at 456.

"In [Michigan] in all but rare instances the questions of negligence and proximate causality

are for the jury where, as here, one has been demanded." *Kubasinski v. Johnson*, 46 Mich. App. 287,

288 (1973) (citations omitted).  "'Only under the most extreme circumstances, those, in fact, where

reasonable minds could not differ upon the facts, or the inferences to be drawn therefrom, can the

case be taken from the jury.'" *Id*. (quoting *McKinney v. Yelavich*, 352 Mich. 687, 692 (1958)).  In

a case where "both parties bear responsibility for some substantial portion of the fault, [it] is [not]

the kind of 'exceptional negligence case' in which summary judgment is appropriate." *Biegas*, 573

F.3d at 376 (quoting *Rogers v. Peabody Coal Co.*, 342 F.2d 749, 751 (6th Cir. 1965)).  In such a

case, where a reasonable person standard must be applied to the conduct of both parties, the

determination "is generally left to the jury."  573 F.3d at 376.  "[E]ven where the trial judge

reasonably may surmise that plaintiff is unlikely to prevail upon a trial, that is not a sufficient basis

for refusing him his day in court with respect to issues which are not shown to be sham, frivolous,

or so unsubstantial that it would obviously be futile to try them." *Rogers v. Peabody Coal Co.*, 342

F.2d 749, 751 (6th Cir. 1965).

When, as in this case, the Michigan No-Fault Act applies, a plaintiff who is determined to

be comparatively more than 50% responsible for his own injuries is precluded from recovering non-

economic damages for personal injuries, or in this case, wrongful death.  The Act provides that non-

economic damages "shall be assessed on the basis of comparative fault, except that damages shall

not be assessed in favor of a party who is more than 50% at fault." Mich. Comp. Laws §
500.3135(2)(b). While comparative fault is usually a question of fact for the jury, the Michigan
Supreme Court has held that when "no reasonable juror could find that defendant was more at fault
than the decedent in the accident as required by MCL 500.3135(2)(b)[,]" a court may resolve the
issue of the availability of non-economic damages as a matter of law. *Huggins v. Scripter*, 469
Mich. 898 (2003) (table case). That is, if it can it be said as a matter of law that Plaintiff's decedent
was more than 50% negligent for his own injuries, Michigan law prohibits the recovery of non-
economic damages in this case.

     **B.**    **Genuine Issues of Material Fact Exist as to Whether Defendants Breached a
Duty Owed to Plaintiff's Decedent**

Defendants argue that Plaintiff has not adduced sufficient evidence in this case to permit a
reasonable juror to conclude that either of the Defendants breached any duty of due care owed to
the Plaintiff's decedent. While they reserve the right to dispute that Plaintiff's proffered experts
meet the requirements of Federal Rule of Civil Procedure 702, they assume the admissibility of those
opinions for purposes of their motion and submit that none of Plaintiff's theories establishes a breach
of any duty of due care.

Plaintiff's principal theory of liability is that it was a breach of the duty of due care for Mr.
Grate to back his trailer to the chute without engaging a third person to act as a spotter, particularly
when Mr. Malburg was in the chute and out of Mr. Grate's sight. Plaintiff also argues that it was
negligent for Defendants to load the trailer with pigs in the pen adjacent to the rolling trailer door,
making it necessary for Mr. Malburg to "get up in the chute" to direct Mr. Grate while he backed
his trailer to the chute.

Plaintiff's expert Mr. Grill states that the applicable FMCSRs charged the Defendants, not

23

the decedent, with the operation of the tractor trailer during the unloading of the pigs and required that the operator of such a commercial motor vehicle possess a certain degree of control when backing up a vehicle and "check path and clearance while backing." (Pl.'s Mot. Ex. J, Grill Report 5.) Plaintiff asserts that Mr. Grate failed to meet this standard when he continued to back up toward the chute after losing sight of Mr. Malburg in his side view mirror. Plaintiff argues that Mr. Grate should have insisted on a spotter who remained on the ground and in sight of Mr. Malburg at all times while directing Mr. Grate back to the chute.

Defendants respond that given the short period of time between the moment when Mr. Malburg drew his arm out of Mr. Grate's sight and the time that the truck bumped up against the chute, Mr. Grate would not have been able at that point to react quickly enough to stop the vehicle. (Defs.' Reply 3 n. 3.) But the evidence on this issue is clearly in dispute. Mr. Grate himself, the only witness on scene, testified that the period of time he continued to back up to the chute after he lost sight of Mr. Malburg's hand was five, six, or maybe 10 seconds, he couldn't be sure. (Grate Dep. 65.) Plaintiff's experts have opined that the time could have been as short as 1.4 seconds. Whatever period of time transpired, it was long enough for Mr. Grate to consider the fact that Mr. Malburg's hand had disappeared from view and to form his conclusion, as he testified in his deposition, that Mr. Malburg at that point knew that Mr. Grate was "doing [his] job" and to conclude further that Mr. Malburg removed his hand from view because he needed to "hold the door rope or something." (Grate Dep. 65.) Because there were no other witnesses, because the evidence is in dispute as to how far from the chute the truck was stopped when it began moving back after Mr. Malburg got up in the chute and as to how fast the truck was moving, and as to what period of time Mr. Grate continued backing up after losing sight of Mr. Malburg's hand, it is impossible to say as

24

a matter of law how long this process might actually have taken or whether Mr. Grate could have reacted in time. Reasonable minds could differ given the evidence as to how much time might have transpired after Mr. Malburg got up in the chute, or how much time might have elapsed after the decedent drew in his hand out of Mr. Grate's sight before the truck impacted the chute, pinning Mr. Malburg's head.

Additionally, genuine issues of material fact exist as to whether or not the rolling trailer door was ever opened by the decedent, signaling to Mr. Grate that it was safe to continue backing up. Mr. Grate testified that he heard the door open but Mr. Green opines that the door was closed at the time of impact with Mr. Malburg's head. The evidence also demonstrates that no pigs escaped from the trailer, further supporting the theory that the door never in fact was raised. Plaintiff submits that this creates a genuine issue of material fact regarding whether the decedent in fact signaled Mr. Grate to continue backing up at all because the decedent never would have waived Mr. Grate back if the door had failed to open.

Defendants place much emphasis on the fact that Mr. Malburg had accepted delivery of pigs in this manner, i.e. by getting up in the chute while the truck backed up toward the chute to ensure that the door of the trailer properly married with the chute so no pigs escape, on at least 30 prior occasions without incident. Mr. Grate testified that on the one prior occasion that he delivered pigs to the Malburg Farm, he believed that Christopher Ott was with him assisting with the unloading. Christopher Ott testified that on approximately 10 prior occasions when he delivered pigs to the Malburg Farm, Mr. Malburg got up in the chute and directed the driver with his hand over the side of the chute, just as he did on the day of the accident and that there were no spotters on those occasions. (Defs.' Mot. Ex. B, Ott Dep. 17-18.) In any event, the fact that Defendants may have

25

breached a duty of due care on prior occasions without incident has no bearing on what occurred on this day, with this driver and this decedent. But more importantly, no one testified that in the past the driver had completely lost sight of Mr. Malburg for a period of time while the truck was moving backwards toward the chute.

Relying on *Kubasinski, supra,* Defendants assert that because Mr. Malburg always "got up in the chute," Mr. Grate was not negligent in failing to secure a spotter or otherwise direct the unloading operation differently because Mr. Grate could not have anticipated Mr. Malburg's own negligence in "placing his head in a zone of danger." (Defs.' Reply 4.) In *Kubasinski*, the court of appeals affirmed a directed verdict for the defendant where plaintiff, a cyclist, was riding in the wrong lane of a two lane highway on a dark, rainy morning and was struck by defendant, who pulled into the lane in which plaintiff was riding to legally pass a slow moving vehicle. There was no evidence of any negligence on defendant's part. The court held that the defendant was not obligated to anticipate plaintiff's negligent and unlawful conduct. *Id.* Although not expressly discussed in the two-page *Kubasinski* opinion, implicit in the court's reasoning was that it was entirely unforeseeable to the defendant, who was traveling in his vehicle obeying all rules of the road, that the plaintiff would be riding in the wrong lane in violation of the rules of the road. Defendants fail to acknowledge this important aspect of the proposition that negligence need not be anticipated. "The rationale . . . that one need not anticipate the negligence of others, even if foreseeable . . . is flawed and inconsistent with traditional principles of negligence law." *Lowe*, 428 Mich. at 461. Here, as discussed *infra*, any negligence on the part of Mr. Malburg was entirely foreseeable.

Based on this evidence, reasonable minds could differ as to whether Defendants breached a duty to use due care in preparing to offload the pigs and in operating the tractor trailer. While

Defendants focus on the fact that Mr. Malburg "always got up in the chute," that is not the critical factor in this case.  Among the acts of negligence that Plaintiff identifies on this particular occasion are the decisions (1) not to use a spotter, (2) to attempt the delivery with pigs loaded in the pen adjacent to the rolling door and (3) to continue backing the trailer up toward the chute after Mr. Grate could no longer see any part of Mr. Malburg's body, a decision which Mr. Grate testified he actually took time to consider.  Plaintiff's experts, whose testimony Defendants accept for purposes of their motion, have testified that continuing to back up the trailer without being able to visualize the person directing them and without a spotter was a violation of the regulations governing the safe operation of a CMV which provide that the operator of a CMV should have an individual directing a truck while it is backing up who should "stand near the back of the vehicle where [the driver] can see him or her."  (Defs.' Mot. Ex. G, Commercial Driver's License Manual § 2.2.4 - Backing Safety.)  It is undisputed that Mr. Grate, at least for a period of time, could not see Mr. Malburg but continued to back up his vehicle.  Mr. Grate himself felt very uncomfortable with the procedure and wished he had insisted that it be done differently.  But he didn't.  Viewing the facts in the light most favorable to the Plaintiff, and drawing all reasonable inferences from those facts in Plaintiff's favor, the Court concludes that genuine issues of material fact exist as to whether Defendants breached a duty of due care owed to Plaintiff's decedent.

### C.    Genuine Issues of Material Fact Remain as to Whether Defendants Were the Proximate Cause of Decedent's Injuries

Defendants assert that, even assuming *arguendo* that their conduct could be negligent based upon the theories advanced by Plaintiff, "Plaintiff's own negligence in re-positioning his head below the floor of the chute was an unforeseeable, intervening and supervening cause of his injuries." (Defs.' Mot. 14.)  "The question of proximate cause, like duty, depends in part on foreseeability. .

. [and] is usually a factual question to be decided by the jury." *Ross v. Glaser*, 220 Mich. App. 183, 192-93 (1997). It is axiomatic that "an intervening act is not a superseding act if the injury was reasonably foreseeable." *Id*. at 193. "When a defendant's negligence enhances the likelihood that the intervening act will occur, the act is reasonably foreseeable, and the defendant remains liable." *Id*.

The relevant inquiry here is whether Mr. Grate could have anticipated that Mr. Malburg might commit some act of negligence himself, that might create a risk of injury during the process of Mr. Grate's backing up the trailer with Mr. Malburg up in the chute (and out of sight). Could Mr. Grate have foreseen that the decedent might slip on the chute or fall when attempting to raise the rolling trailer door, or any one of a number of occurrences that might have resulted in injury or death to Mr. Malburg if the trailer continued to back toward the chute, particularly while Mr. Malburg was out of Mr. Grate's sight? As discussed *supra*, every person who ever had occasion to deliver pigs to the Malburg Farm was uncomfortable with the design of the decedent's chute and had every reason to anticipate that some type of safety incident might occur. Reasonable minds could conclude that Mr. Grate should have anticipated that Mr. Malburg may have fallen into harm's way, even if through his own negligence, particularly when Mr. Grate concedes that he lost sight of Mr. Malburg's hand directing him back.

To be sure, reasonable minds could conclude that the Mr. Malburg bears some responsibility for the risk he assumed in insisting on getting up in the chute for what everyone considered to be a non-standard method of unloading the pigs. *See Modzel v. Norwalk Truck Lines*, 325 Mich. 693, 698 (1949) ("One who knows or in the exercise of ordinary care should have known the existence of danger from which injury might reasonably be anticipated and who by his voluntary acts or

28

omissions exposes himself to such danger is guilty of negligence, if under the circumstances an ordinarily prudent person would not have incurred the risk of injury which such conduct involved."). This does not alter the fact that reasonable minds also could conclude that these Defendants should have foreseen that some type of injury might result from the decedent's method of unloading pigs, particularly when it is undisputed that Mr. Grate entirely lost sight of Mr. Malburg's hand.

In this case, reasonable minds could differ on the question of whether the Defendants were or should have been aware that an injury might occur, or that the decedent may have committed an act of negligence, while Mr. Malburg directed the trailer back to the chute while standing in the chute. That the decedent may have stepped in harm's way while directing the pig delivery in this manner was entirely foreseeable. In fact, the possibility of an accident occurring with this manner of delivery had been a worry of Christopher Ott, Troy Kagy and Defendant Brian Grate. Mr. Grate testified that he was personally uncomfortable with the safety of backing up with Mr. Malburg in the chute, as were Christopher Ott and Troy Kagy, each of whom testified that the procedure used at the Malburg Farm was not standard procedure, was not used at any other farm to which they delivered pigs and posed potential safety concerns. Indeed, in their motion, Defendants state that the testimony of these witnesses regarding the potential safety concerns with the method of unloading utilized by the Malburgs demonstrates at most "that they had concerns about Mr. Malburg possibly doing something negligent while he was there." (Defs.' Mot. 11.) This is a concession that Mr. Malburg's negligence was foreseeable in this case.

Based on these facts, and taking them in the light most favorable to the Plaintiff, a reasonable juror could conclude that any negligence on decedent's part was foreseeable - indeed the risk of harm from the unloading method utilized at the Malburg Farm had been observed by Kagy, Ott and

Grate - and that therefore Plaintiff's decedent's intervening negligence, if found, should not, as a matter of law, relieve Defendants of liability for their own negligence, if found. The Court concludes that genuine issues of fact remain as to whether the decedent's negligence, if any, was an intervening and superseding cause of his death.

D.    **Reasonable Minds Could Differ as to Whether the Decedent was More Than 50% Negligent in Causing the Accident and Therefore Plaintiff is Not Barred As A Matter of Law From Recovering Non-Economic Damages**

Because this case is covered by the Michigan No-Fault Act, Plaintiff is precluded from recovering non-economic damages if the decedent is found to be greater than 50% at fault for the accident that caused his death. "Damages shall be assessed on the basis of comparative fault, except that damages shall not be assessed in favor of a party who is more than 50% at fault." Mich. Comp. Laws § 500.3135(2)(b). As noted *supra*, the standards for determining comparative negligence are identical to the standards for determining negligence. *Lowe*, 428 Mich. at 461.

Defendants rely on a number of cases in which the fault of the plaintiff was found, as a matter of law, to be greater than 50% when compared to the fault of the defendant. In *Huggins, supra,* the Michigan Supreme Court remanded for entry of summary judgment concluding that no reasonable juror could find that defendant was more at fault than plaintiff where, although defendant did take his eyes off the road to look at his watch, plaintiff was crouching or kneeling in the middle of an unlit road in the middle of the night wearing dark clothing at the time he was struck by defendant. An accident reconstructionist had testified that no driver would have had enough time to react and avoid the plaintiff, who was positioned in the road just over the crest of a hill.

In *Davis v. Williams*, No. 278713, 2008 WL 5101634 (Mich. Ct. App. Dec. 4, 2008) (unpublished), the Court of Appeals affirmed a grant of summary judgment in favor of defendant

based upon a finding that plaintiff was more than 50% negligent for his injuries. In *Davis*, the defendant was transporting a load of steel coils, traveling in the right lane of a divided four lane highway at approximately 55 mph, when he spotted plaintiff's vehicle approaching at high rate of speed behind him. *Id*. at *1. The plaintiff (traveling at an estimated speed of 75 to 80 mph) passed the defendant on the left and began to cut back across to the right in front of the defendant's tractor-trailer. At the same time, an animal darted out in front of the plaintiff's car and swerved to miss the animal, losing control of his car. Defendant was fearful that braking too hard would cause his load of coils to spill onto the roadway or shoot forward into the cab of the truck. He was unable to brake in sufficient time to avoid hitting plaintiff's car. Plaintiff suffered severe injuries. *Id*. The Court of Appeals found that "the trial court had properly held that the plaintiff failed to establish any facts that could lead a reasonable juror to conclude that plaintiff was not less than 50 percent at fault." *Id*. at *2.

In *Misson v. Corbett*, No. 294905, 2011 Mich. App. LEXIS 359 (Feb. 17, 2011), plaintiff had been hired to clean the gutters on defendant's home and was severely injured when he fell from the roof after encountering a swarm of bees. The defendant homeowner had warned the plaintiff before he began the job that there were bees around the roof and provided the defendant with a can of bee spray. *Id*. at *1. Despite his contractor's instructions to use a harness and lanyard when cleaning the gutters, defendant proceeded to the roof and sprayed the bees, eventually knocking off a small cone of the beehive with a broom handle. *Id*. at *2. At this, a swarm of bees emerged and the defendant fell off the roof. Although not covered by the Michigan No-Fault Act, Mich. Comp. Laws § 600.2959 contains the same bar to damages where the plaintiff's negligence is greater than 50% percent. The Court of Appeals concluded that the trial court did not err in finding that plaintiff

31

was more than 50% at fault, precluding recovery of damages as a matter of law.

> Here, there was no genuine issue of material fact that plaintiff failed to use a safety harness or rope, despite instructions to do so, and deliberately disturbed a beehive by spraying it with bee spray and knocking it with a broom handle while on top of a two to three story roof with the knowledge that bees were present. The subsequent bee swarm caused his eventual fall. On these facts, reasonable minds could not differ that plaintiff's negligent conduct was the cause in fact as well as the proximate cause of his injuries. There was minimal, if any, evidence tending to indicate that defendant's conduct contributed to plaintiff's injuries. To the contrary, defendants warned plaintiff of the presence of bees on the premises, and it was not reasonably foreseeable that a subcontractor would work on the two to three story roof without taking safety precautions. On such facts, we find, as a matter of law, that plaintiff's fault in deliberately disturbing the hive and failing to take safety precautions to protect himself in the event of a fall exceeded defendant's fault, if any.

*Id*. at *8-9.

Defendants also rely on *Peterson v. Corder*, No. 251127, 2005 WL 234391 (Mich. Ct. App. Feb. 1, 2005), in which the Michigan Court of Appeals concluded, in a one-page unpublished opinion, that there was no genuine issue of material fact that plaintiff, who made an illegal turn into an oncoming lane of traffic and attempted to pass the defendant, who was making a left hand turn, was wholly responsible for his own injuries. The court concluded that the defendant "had no responsibility to see and anticipate plaintiff's illegal, and unusual, approach from behind." *Id*. at *1.

However, in *Biegas, supra*, the Sixth Circuit held that the district court erred in finding, as a matter of law, that the plaintiff was more than 50% negligent and instructing the jury to allocate fault accordingly. The Sixth Circuit held that genuine issues of material fact existed as to whether the negligence of a dump truck driver (Biegas), who was standing on the side of the road tending to his damaged vehicle, exceeded the negligence of the driver (Dailey) of a passing tractor-trailer, who struck and killed the dump truck driver. The evidence established that Dailey was driving his tractor trailer negligently, in violation of at least two applicable laws and/or regulations. *Id*. at 375.

32

In addition, the evidence established that Dailey's truck had veered over the fog line and struck portions of Biegas's truck and trailer that were stopped several inches to the right of the fog line, well onto the shoulder. *Id.* The district court rejected many of the plaintiff's theories of comparative negligence but found that Biegas was negligent in failing to park his truck further to the right of the fog line and in walking from the shoulder into the lane of traffic without first checking for traffic. *Id.* at 375-76. The district court found that these errors by Biegas outweighed Dailey's negligence as a matter of law and instructed the jury to apportion fault accordingly. Finding that the district court erred in ruling as a matter of law that Biegas's fault was greater than Dailey's, the Sixth Circuit held:

> Taking the facts in the light most favorable to the Estate, we cannot say that Biegas's negligence exceeded Dailey's as a matter of law. It is clear that Biegas parked quite close to the fog line and that he should not have stepped onto the roadway without first checking for oncoming traffic. However, if Dailey had been following the preceding truck at a safe distance, he should have had sufficient time to see Biegas and move safely to the left of his own lane to avoid any contact with Biegas and his vehicle. Instead, Dailey allowed his tractor-trailer to drift at least three inches over the right fog line, sideswiping Biegas's parked vehicle and crushing Biegas's body between the two vehicles. Given that both parties bear responsibility for some substantial portion of the fault, we do not believe that this is the kind of "exceptional negligence case" in which summary judgment is appropriate. Rather this case turns on applying a reasonable-person standard to the conduct of both Biegas and Dailey – a determination that is generally left to the jury. We therefore believe that there is a genuine issue of material fact as to whether the negligence of Biegas in parking close to the fog line and stepping into the lane of traffic exceeded the negligence of Dailey in following the preceding truck too closely and allowing his tractor-trailer to cross the fog line. Accordingly, we hold that the district court erred in granting Quickway's motion for partial summary judgment.

573 F.3d at 376.

Defendants distinguish *Biegas*, arguing that there was "ample evidence" there that the defendant was speeding, following traffic too closely and that he drifted past the fog line of the road at the point that he struck the plaintiff. Defendants assert that Plaintiff in the instant case has failed

33

to show that Defendants engaged in "any similar negligence" or that any such negligence is greater than decedent's negligence.  Defendants urge the Court to conclude, as a matter of law, that if they are found to be negligent in some measure, the decedent was at least 50% negligent and Plaintiff is therefore barred from recovering non-economic damages.

Defendants also direct the Court's attention to the facts of *Modzel*, *supra*, in which the plaintiff's negligence in placing himself in a position of known danger between the rear of a truck and a loading dock was found to bar his claim for damages, despite the negligence of the operator of the truck who failed to properly apply a brake lock before leaving the vehicle unattended, allowing the truck to roll back on its own, pinning the plaintiff between the truck and the loading dock.  325 Mich. at 695.  Finding no genuine issue of material fact that plaintiff was guilty of contributory negligence that was the proximate cause of his injuries, the Michigan Supreme Court held:

> Plaintiff stopped and remained in a position of danger without regard for his own safety.  He chose a place which he knew or should have known was a place of danger, and was guilty of contributory negligence which was a proximate cause of his injury. One who knows or in the exercise of ordinary care should have known the existence of danger from which injury might reasonably be anticipated and who by his voluntary acts or omissions exposes himself to such danger is guilty of negligence, if under the circumstances an ordinarily prudent person would not have incurred the risk of injury which such conduct involved.

325 Mich. at 698.  While *Modzel* may bear factually similarities to the instant case, it was decided when the law of comparative negligence had not yet been adopted in Michigan and hence in *Modzel* any amount of negligence on the part of a plaintiff was sufficient to cut off a defendant's liability for his own negligence.  At the time of decedent's accident, the law in Michigan had long-since changed:

> Michigan has replaced the doctrine of contributory negligence with the doctrine of

34

> comparative negligence. M.C.L. § 600.2959; *see also Placek v. Sterling Hts.*, 405 Mich. 638, 650, 275 N.W.2d 511 (1979). Comparative negligence only serves to reduce the amount of damages a plaintiff may recover to the extent that the plaintiff was negligent, whereas any negligence on the part of the plaintiff would bar recovery under the doctrine of contributory negligence.

*Hill v. Hoig*, 258 Mich. App. 538, 533 (2003). Thus, while the facts are similar, the legal analysis in *Modzel* is quite unhelpful because under the law of comparative negligence, the inquiry no longer ends with a finding of plaintiff's negligence.

Viewing the facts in the light most favorable to the Plaintiff and granting all reasonable inferences that can be drawn from the evidence to the Plaintiff, and further refusing as it must to weigh the evidence or to judge the credibility of the witnesses, the Court finds that reasonable minds could differ as to who bears the greater share of responsibility for decedent's death. Defendants assume the validity of Plaintiff's expert's opinions for purposes of the motion and those experts opine that Mr. Grate did violate the standard of care required of an operator of tractor trailer by failing to ensure that there was a clear path behind the trailer, failing to engage a spotter who could remain visible to the driver at all times and failing to stop the vehicle when Mr. Grate was no longer visible. Based on these facts, a reasonable juror could conclude that Mr. Grate was, to some degree, negligent.

The question is whether this case, unlike *Biegas*, is that "exceptional negligence case" in which summary judgment is appropriate on the issue of the proportionate share of any comparative fault. Is this case more like *Davis*, *Misson* and *Peterson*, *supra*, where the plaintiff's culpability so far outweighed the defendant's negligence that reasonable minds could not possibly draw but one inference from the facts and come to but one conclusion as to who bore the greater degree of fault? Or does this case bear a greater similarity to *Biegas*, where reasonable minds might differ when

applying a reasonable-person standard to both the conduct of the decedent and the Defendant? Can it be said as a matter of law that this decedent was more than half to blame for the circumstance of his death? The Court concludes that the facts of this case bear greater resemblance to *Biegas* and that the issue of the proportionte share of the fault is one upon which reasonable minds could differ. Thus, Plaintiff is not barred from seeking to recover non-economic damages as a matter of law.

## IV.     CONCLUSION

For the foregoing reasons, the Court concludes that genuine issues of material fact remain as to whether Defendants breached a duty to the Plaintiff and as to whether Mr. Grate's negligence was a proximate cause of Plaintiff's injuries. Accordingly, the Court DENIES Defendants' motion for summary judgment on the issue of negligence. Additionally, the Court concludes that reasonable minds could differ as to whether Plaintiff's decedent was more than 50% responsible for his own death and therefore DENIES Defendants' motion for partial summary judgment that would bar Plaintiff from recovering non-economic damages.

Accordingly, Defendants' motion for summary judgment (ECF No. 14) is DENIED.

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 6, 2013

36

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 6, 2013.

s/Deborah Tofil
Case Manager